Filed 11/4/15  P. v. Delgado CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD ANTHONY DELGADO,<br><br>    Defendant and Appellant. | H039723<br>(Santa Clara County<br>Super. Ct. No. CC932306)<br><br>**ORDER MODIFYING OPINION**<br>**NO CHANGE IN THE JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on October 13, 2015, be modified as follows:

On page 25, in the last partial paragraph, a footnote is added at the end of the following sentence:  "Based on the evolution of the statute and its legislative history, defendant argues that the Legislature did not intend to eliminate the possibility of involuntary manslaughter as a lesser included offense of vehicular murder."  The footnote, numbered five, states:  "Defendant's request for judicial notice of various materials setting forth the relevant legislative history is hereby granted.  (Evid. Code, §§ 452, 459.)"

There is no change in the judgment.

Date: _____          _____
                                                                              MÁRQUEZ, J.


_____          _____
RUSHING, P. J.                                      WALSH, J.[*]

_____

[*]Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 10/13/15  P. v. Delgado CA6 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD ANTHONY DELGADO,<br><br>    Defendant and Appellant. | H039723<br>(Santa Clara County<br>Super. Ct. No. CC932306) |

A jury found defendant Richard Anthony Delgado guilty of second degree murder for killing his neighbor Donna Fife by running over her with a Honda Civic.  (Pen. Code, § 187.)[1]  The incident occurred on the front lawn of a neighbor's house. Defendant's neighbors had been gathered around the house after defendant had been seen "doing donuts" in the street in his grandfather's car, leaving wreckage in a fence. Although the jury found defendant guilty of second degree murder, it returned no finding on the allegation that defendant personally used the car as a deadly or dangerous weapon in the commission of the offense.  (§12022, subd. (b)(1).)  The trial court sentenced defendant to a term of 15 years to life.

Defendant did not testify at trial.  However, the prosecution sought to introduce portions of two out-of-court statements he had made while in custody.  Defendant, in

_____

[1] Subsequent undesignated statutory references are to the Penal Code.

turn, moved to introduce other portions of those statements under Evidence Code section 356, the rule of completeness. The trial court granted defendant's motion. In response, the prosecution moved to introduce defendant's prior convictions and bad acts to impeach his credibility. The trial court granted the prosecution's motion.

On appeal, defendant contends the trial court erred by admitting evidence of his prior convictions and bad acts for the purpose of impeaching his hearsay statements. Defendant alternately frames his claim as one of ineffective assistance of counsel for his trial counsel's request to admit defendant's exculpatory statements, thereby opening the door to impeachment evidence. Second, defendant contends the trial court erred by failing to instruct the jury on manslaughter as a lesser included offense. Third, he contends the trial court erred by failing to clarify the phrase "unlawful intent" in response to a question from the jury seeking clarification of an instruction on excusable homicide as the result of accident or misfortune.

We conclude defendant's claims are without merit, and we will affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. *Facts of the Offense*

In 2009, defendant, then 20 years old, lived at his grandfather's house on Thainwood Way in San José.[2] On the evening of January 19, neighbors saw defendant "doing donuts" in the street with his grandfather's car. Defendant drove away after striking a fence, but soon returned on foot and retreated into his grandfather's house while neighbors gathered outside. He subsequently exited the house, got into his grandfather's Honda Civic parked in the driveway, and drove the car across a neighbor's front lawn. In doing so, he struck and killed Donna Fife, one of the neighbors. He then drove away from the scene. Police detained him several hours later.

---

[2] All dates occurred in 2009 unless otherwise specified.

1. *Testimony of Adnan Rasheed*

Adnan Rasheed lived across the street from Donna Fife's house on Thainwood Way. At around 11 p.m. on January 19, Rasheed heard the sound of tires squealing. He went outside and saw a lot smoke. A black car was "doing donuts" (driving in circles). Rasheed identified defendant as the driver. After defendant made the last donut, he drove down Thainwood Way. He attempted to make another donut but lost control of the car and struck a fence. Defendant then drove the car back up Thainwood, turned onto another street, and drove away. Rasheed walked down the street to look at the fence. He saw a hole in the fence, and a fender or a bumper lodged in the fence. Five or six neighbors came out of their houses to look at the fence. Rasheed called 911 and reported the number of the license plate on the bumper lodged in the fence. He told police defendant was the driver.

As Rasheed was walking back toward his house, he saw defendant lurking behind a van. Rasheed approached defendant and said: "What the hell are you doing?" Defendant responded: "What the fuck you talking about." Defendant ran toward his grandfather's house. The neighbors were yelling at defendant, and they were "exchanging words back and forth." Rasheed went back into his house to put on some more clothes.

Rasheed came back out of his house about five minutes later. He returned to the area of the fence where the bumper was lodged. A number of neighbors had gathered there. They had been waiting for the police for about 15 minutes, and Rasheed was getting frustrated. Rasheed saw defendant peeking out from a window of his grandfather's house. Rasheed called 911 again and told the dispatcher that defendant had gone into his grandfather's house.

Rasheed then saw defendant exit the house and approach a Honda Civic parked in the driveway. The front of the car was facing the garage door of the house. Defendant did not get into the car at that point, and instead went back into the house. Defendant

came out of the house a second time and again returned back into the house. Defendant then came out of the house a third time and got into the Honda. His grandfather (hereafter Grandfather) came out of the house after him and tried to get the car keys back. Grandfather got behind the car, but the neighbors yelled at him to move away because defendant was backing out, so Grandfather got out of the way. Rasheed then heard Donna Fife say: "[W]e are sick and tired of this, but we have to get his license plate number."

Defendant backed halfway into the street and stopped, such that only the back end of the car was in the street. There was nothing behind him to block him from going completely into the street. Rasheed heard defendant "mumble[] a lot of things," but the last thing Rasheed heard was "I'm going to get you." Defendant then accelerated forward. Donna Fife was standing in the middle of the neighbor's front yard when defendant struck her. The car was going straight toward her, and defendant was accelerating at the time. He did not try to turn away or swerve to miss her. Fife's body went underneath the front of the car. Rasheed could see her head and chest between the front and rear tires on the driver's side. He saw the car lurch upwards as it went over Fife's body. After defendant drove over her, he "kind of slowed down," looked back, and accelerated again. Defendant then drove away down a nearby street. Rasheed went to tend to Fife and found her in "[b]ad, bad shape" with blood coming out of her eyes, nose, and mouth. Rasheed and another neighbor called 911 again.

2. *Testimony of Terry Ann Krystad*

Terry Ann Krystad and her husband lived on Thainwood Way at the time of the offense. They had just finished dinner when they heard a loud noise outside. They went outside and saw a bumper lodged in a fence across the street. Three or four other neighbors had gathered outside, including Donna Fife. Krystad called 911 to report a hit and run. The area was covered by a working streetlight, and there was partial moonlight.

4

Krystad had no difficulty seeing the hole in the fence or the other neighbors who were standing outside.

While Krystad and other neighbors were standing by the bumper in the fence, they saw defendant running down the street toward his house. A young man or an older teenager was chasing him. Krystad heard another woman tell the young man not to chase defendant because he would retaliate. The young man caught up with defendant on the porch of defendant's house. They fell to the ground and wrestled with each other for a couple of seconds. Defendant then got up and ran into his house. Krystad and three or four other neighbors stayed outside, watching defendant's house. One of the other neighbors made another call to 911.

Krystad saw defendant peeking out of a window. The lights were on in the house, and defendant was looking out from behind the curtains. After three or four minutes, defendant came out of the house and tried to get into a Honda parked in the driveway. He could not open the door, so he went back into the house. He then came back out of the house again and appeared to be more adamant about getting into the Honda. Krystad heard one of the neighbors say: "He's trying to leave. We should get his license." Donna Fife went into the street to get a better view of the license plate while a couple of the other neighbors tried to get a view of it from another angle.

When defendant came out of the house again, he was able to get into the Honda. He started the car and backed up a short distance. The car was at an angle with the rear end on the sidewalk. There was nothing blocking him from going back into the street. His window was down and Krystad could see him clearly. She heard him say, in a determined tone of voice: "Watch this." At that point, Krystad moved behind a van and lost sight of the vehicle. The next thing Krystad heard was a "thud." When she came around the side of the van, she could see the Honda on the neighbor's lawn. Defendant looked around, drove across the yard onto the street, and drove away. Krystad saw Fife lying on the ground, moaning.

5

### 3. *Testimony of Richard Delgado Sr.*

Richard Delgado Sr. was defendant's grandfather. Defendant had lived with Grandfather for most of his life. When Grandfather came home from work on the day of the offense, defendant was not home. The black Lincoln that belonged to Grandfather was also gone. But Grandfather's Honda Civic was parked in the driveway. After dinner, Grandfather went to sleep because he had to get up for work at 4:30 a.m. the next morning.

Later that evening, defendant woke up Grandfather and told him somebody was looking at one of the cars. Grandfather did not give defendant any car keys at that point, but defendant came back a second time, whereupon Grandfather gave him the keys to the Honda. Defendant went out the front door while Grandfather put on some clothes. When he went outside, he saw defendant driving the Honda backwards. Defendant backed the car into the street, but then pulled back into the driveway. Grandfather could see Donna Fife standing next to a nearby lamppost. Defendant had his headlights on. Defendant then drove over the neighbor's driveway and onto their lawn. At that point, Donna Fife was on the lawn. She then moved in front of the car, "almost like a suicide act." She was moving back and forth in front of the car. Defendant hesitated, but then ran over her. Grandfather saw her body go under the car and come out from underneath the car on the driver's side. Defendant stopped, opened the door, looked back, closed the door, and drove away.

### 4. *Grandfather's Prior Interview With Police*

San José Police Officer Brian Spears interviewed Grandfather on the night of the offense. According to Officer Spears, Grandfather described himself as screaming at defendant when he (Grandfather) came out of the house. Grandfather told Officer Spears that defendant backed up the car in the driveway in a "sharp fast" manner. When the car hit Donna Fife, it made a loud sound that caused Grandfather's stomach to "jump out." At no point did Grandfather tell Officer Spears that Fife was moving back and forth in

6

front of the car. In fact, he told Officer Spears he believed defendant ran over Fife on purpose.

5. *Testimony of Mark Fife*

Mark Fife, the victim's husband, testified that he and Donna Fife had lived on Thainwood Way for almost 25 years. At around 11 p.m. on January 19, he heard spinning tires and a loud crash outside. Donna told him: "That's it. I'm not putting up with this anymore." She then left the house. After some time, Mark became concerned that she had been gone too long. When he was about to go outside, he heard someone running up the sidewalk yelling, "[O]h, my god! He hit his wife." Mark immediately went outside and ran to his wife, who was lying on a neighbor's lawn. Donna was having a hard time breathing and she could not speak. Her eyes were glazed over, her shoes had been knocked off, and her clothes were ripped.

Mark Fife testified about prior incidents of defendant's reckless driving. One night, defendant had run over some juniper bushes the Fifes had planted on the corner. The Fifes filed a police report and confronted defendant the next day. Donna Fife sternly admonished defendant about the dangers of driving recklessly in a neighborhood full of children.

6. *Testimony of Riley Jones*

Riley Jones testified that defendant had lived next door to him on Thainwood Way. Defendant was Jones' best friend; they spent time together every day. Jones also shared a jail cell with defendant after defendant was taken into custody for killing Fife. Jones admitted he had been convicted of numerous felonies, including possession of stolen property, possession of a firearm, possession of a weapon, auto theft, second degree robbery, and false imprisonment. In 2011, Jones wrote a letter from jail to the District Attorney's office offering to provide information about defendant. Jones hoped it might help with a case pending against him, but he did not ask for any help in the letter.

7

Jones testified that defendant had confessed to certain facts about the offense. According to Jones, defendant told him the following version of events: On the day of the offense, defendant "went and got high with some of the homies" and drove back to the neighborhood to do donuts in the street. After he crashed the car, he began walking back to his house. Donna Fife followed defendant from behind, "questioning him like what's the problem, what's happening, you're out here doing donuts, this and that." Defendant told her to stay out of his business, and they exchanged "heated words." Fife continued to follow defendant. According to Jones, "[defendant] just told me that, he told her, bitch, you still want to follow me? He told me he's going to kill her, right?" Defendant then entered his house and retrieved the keys to the Honda from Grandfather's room. When defendant exited the house, he backed up the Honda, drove forward, and hit Fife. After he hit her, he backed over her. He then parked the car and left.

7. *Forensic Evidence and Expert Testimony*

San José Police Officer Kevin Cassidy testified for the prosecution as an expert in traffic collision investigation reconstruction. He arrived at Thainwood Way several hours after the offense. Cassidy and other officers mapped out the area, took photographs, and made measurements to record the location of evidence and the geometry of the scene. Officer Cassidy paid particular attention to the tire marks left on the ground by the Honda. He identified a set of tire marks starting on the sidewalk in front of Grandfather's house, crossing the driveway, and continuing across the grassy lawns of the houses to the left. Officer Cassidy testified that the car must have been accelerating throughout its pathway. He based this conclusion on the rubber deposited on the concrete of the driveway and grass that had been torn up and thrown backwards. In one of the tire tracks on the lawn, Officer Cassidy identified a gap large enough to fit a human body. The ground at that spot was slightly depressed. At the spot where the tire track resumed, the grass was worn down to the dirt, suggesting the tire was spinning at high speed when it

8

recontacted the ground. Officer Cassidy opined that this gap marked the point where Fife had been run over by the tires of the car.

Based on his examination of the front of the car and the coroner's report, Officer Cassidy opined that Fife was not standing up straight when she was struck. He opined that she had either fallen down or was in the process of falling when the car hit her. He also opined there was no evidence the car stopped, backed up, and then drove forward a second time. And there was no evidence the driver applied the brakes or tried to stop the car at any point, or that the driver had lost control of the car.

Officer Cassidy estimated the car was traveling at around 15 to 20 miles per hour when it struck Fife. Fife was run over twice—once by the front wheel and once by the rear wheel. Officer Cassidy testified that, as the vehicle drove over a body the size of Fife's body, this would have been "very, very noticeable" to the driver.

Police tested the Honda Civic's headlights and determined they were functioning properly. Officer Cassidy testified that the area was also illuminated by a street lamp. The distance from the center of Grandfather's driveway to the point of impact was approximately 50 feet. Officer Cassidy estimated it would have taken the car about four to five seconds to travel from the point where the tire treads started on the driveway to the point of impact. Based on the evidence he had observed, Officer Cassidy opined that the driver of the Honda Civic intentionally hit Fife.

In September 2012, Officer Whittington, a criminal investigator for the District Attorney's office, took a Honda Civic to the scene of the offense one night at about 10 p.m. He positioned the car on Grandfather's driveway with the front of the car pointed left across the neighbor's lawn. The area was illuminated by street lights and the headlights of the car. While sitting in the car, Officer Whittington was able to see a female colleague walking across the neighbor's lawn. He could see her regardless of whether his headlights were on. When she lay down on the lawn, Officer Whittington could still see her, both with and without his headlights on. Officer Whittington then

9

drove the car several feet onto the neighbor's lawn. He could still see the woman on the lawn in front of him whether she was walking across the lawn or lying on the ground, regardless of whether his headlights were on. They repeated the experiment two more times, each time moving the vehicle forward a few feet. Officer Whittington could still see the woman in front of him. He did not start to lose sight of the woman until she was lying on the ground six feet away from the front of the car.

The parties stipulated that Donna Fife died as the result of blunt force trauma to her chest. Her injuries were "consistent with at least one wheel of the car rolling over her chest or back and compressing her ribs and internal organs causing the fractures and internal trauma observed during her autopsy."

8. *Prior Incidents of Reckless Driving*

The prosecution presented evidence of five prior incidents of reckless driving by defendant.

In March 2006, defendant drove a Toyota RAV4 across a high school soccer field and onto a set of basketball courts. There were students on the field and the courts at the time. Defendant then drove through a parking lot and knocked down a fence. A witness told police the car was traveling at about 35 miles per hour.

In April 2006, defendant was driving a Mitsubishi Eclipse at about 90 to 100 miles per hour on Highway 101. A motorist driving a Honda changed lanes, pulling in front of the Eclipse. Defendant attempted to bypass the Honda by veering onto the shoulder, but he struck the rear of the Honda, causing the driver to lose control of the car. The Honda spun out of control and collided with a Dodge Durango in the next lane. The driver of the Durango, in turn, lost control of his vehicle, whereupon it crossed several lanes of traffic, veered off the side of the highway, and rolled over. Defendant fled the scene of the accident on foot, but police later apprehended him, and he admitted to being the driver of the Mitsubishi Eclipse at the time of the accident. Defendant told police he had

10

gotten the car from "some dudes" who offered it to him on the street. He admitted that "it's possible" the car had been stolen.

In May 2006, police spotted defendant driving a Honda Civic at high speed on Jackson Avenue in San José. When defendant stopped at an intersection, the police pulled up next to him. When the light turned green, the Honda "peeled out" and accelerated at high speed. The police turned on their lights and pursued the Honda. Defendant accelerated to approximately 70 miles per hour; the speed limit was 35 miles per hour. As the police continued their pursuit, defendant pulled into the opposite lane, driving into oncoming traffic. Defendant drove through two red lights and nearly collided with another vehicle. The police lost sight of the Honda, but subsequently spotted it again. After the Honda stopped at another light, they were able to pull in front of it and block it from driving forward. The police pulled defendant out of the car and took him into custody.

In July 2006, police saw defendant drive past them in a Mitsubishi pickup truck at approximately 100 miles per hour on Highway 101. The police pursued the Mitsubishi, which reached speeds of 105 to 110 miles per hour. Although the police had activated their lights, the Mitsubishi did not slow down. The truck passed other vehicles on the highway and used multiple lanes without signaling. After a 28-mile pursuit, defendant took the Bernal Road exit off of Highway 101 and came to a stop on the shoulder. The police took him into custody. Defendant smelled of alcohol and displayed signs of intoxication. Defendant told police he had drunk four 12-ounce beers and smoked a marijuana cigar. A preliminary alcohol screen showed defendant's blood alcohol level was 0.10 percent.

In June 2008, San José Police Officer Jeff Nichols was dispatched to defendant's house on Thainwood Way. Officer Nichols observed several black skid marks on the road, including a "high intensity skid mark" that appeared to be freshly made. Two tires on Grandfather's Lincoln were blown out. Officer Nichols also observed rubber marks

11

on the curb. He opined that one of the Lincoln's tires had hit the curb, causing it to blow out on impact. Officer Nichols arrested defendant for reckless driving, hit and run, and driving without a license. Officer Nichols warned defendant that he could potentially kill somebody or hurt himself if he continued his dangerous behavior. The prosecution presented records of misdemeanor convictions for reckless driving and driving without a license in connection with the incident.

9. *Other Prior Offenses and Bad Acts*

The prosecution presented evidence of several non-driving-related offenses by defendant. In November 2008, defendant was convicted of felony grand theft for stealing a bicycle. (§§ 484, 487, subd. (a).) In December 2008, defendant was convicted of misdemeanor receiving stolen property. In 2012, defendant was convicted of felony assault and false imprisonment upon his sister. (§§ 245, subd. (a)(1), 236, 237.) The prosecution presented the complaints and the minutes of the plea hearings to prove the convictions.

In March 2010, while defendant was in custody, he assaulted a fellow inmate. A prison guard testified the assault occurred while escorting inmate Mario Garcia back to his cell after a shower. While Garcia was handcuffed, defendant reached through the bars of his cell and slashed Garcia on the face. Garcia suffered a cut across his cheek and nose.

Defendant committed a similar assault on another inmate in December 2010. A prison guard testified the assault occurred while escorting Jesse Madrigal back to his cell after a shower. Madrigal's hands were handcuffed behind him. Defendant, who was in his cell, asked Madrigal if he wanted a copy of a newspaper. When Madrigal turned to accept the newspaper with his hands, defendant reached through a food tray slot and grabbed one of Madrigal's hands. Defendant stabbed Madrigal in the back with a "homemade shank" and flushed the weapon down the toilet.

12

Grandfather testified that when defendant was 17 years old, he had been brought home for a temporary furlough from the "ranch," a juvenile custody facility. When it was time to take defendant back to the ranch, he ran away for a few weeks.

B. *Procedural Background*

The prosecution charged defendant by felony information with one count of murder. (§ 187.) The information included the allegation that defendant personally used a deadly or dangerous weapon—a car—in the commission of the offense. (§ 12022, subd. (b)(1).)

The case first went to trial in March 2012, but the jury failed to reach a verdict and the trial court declared a mistrial. The second trial began in February 2013. The jury acquitted defendant of first degree murder but found him guilty of second degree murder. The jury returned no finding on the deadly weapon allegation. The prosecution moved to dismiss the allegation; the court granted the prosecution's motion. The court subsequently sentenced defendant to a term of 15 years to life.

## II. DISCUSSION

A. *Admission of Defendant's Prior Convictions and Bad Acts*

Defendant did not testify at trial. He contends the trial court therefore erred by admitting certain evidence of his prior convictions and bad acts. The Attorney General argues that the trial court properly admitted the evidence for the purpose of impeaching hearsay statements defendant had made to his sister and Grandfather. Defendant argues that the statements the prosecution sought to impeach were not exculpatory, and therefore could not justify the admission of his prior bad acts. He further argues that admission of the evidence violated Evidence Code section 352 because the prejudicial effect of the evidence substantially outweighed its probative value. Defendant alternately frames his claim as one of ineffective assistance of counsel.

We conclude the statements the prosecution sought to impeach contained exculpatory claims. Accordingly, the trial court did not abuse its discretion by admitting

evidence of defendant's bad acts under Evidence Code sections 788 and 1202. (*People v. Jacobs* (2000) 78 Cal.App.4th 1444 (*Jacobs*)). Furthermore, the record shows trial counsel's request to admit defendant's statements was a deliberate tactical choice; therefore, we find no merit to the claim of ineffective assistance of counsel.

1. *Factual Background*

Admission of the prior bad acts evidence was premised on the admission of two out-of-court statements defendant made while he was in custody: a jailhouse conversation he had with Grandfather, and a letter he wrote to his sister.

On the day after the offense, while defendant was in custody, police recorded a jailhouse conversation between defendant and Grandfather. When Grandfather asked defendant what had happened, defendant told him: "Grandpa don't talk about nothing, Grandpa. Don't talk about nothing like that." Similarly, defendant told Grandfather: "[D]on't talk to no cops about nothing. We need a lawyer. Just don't—don't talk about nothing." Defendant then made a number of statements inculpating himself in the offense. Among other things, he stated that when he had arrived home the previous evening, "there was a whole bunch of people out and around there" who were "yelling a whole bunch of stuff at me." He told Grandfather, "What's done is done," and "I can't take back what happened, all I can do is tell you I'm sorry." When Grandfather expressed hope the victim had not died, defendant said: "They're already dead," and "I killed somebody grandpa." Defendant told Grandfather that the police investigating his case were homicide detectives, and he added: "That's what they're trying—that's what they're trying to tell—that's what they're trying to pin on me. A murder. I don't know, well I'm stuck."

Grandfather asked defendant why the neighbors were "throwing stuff" at him. Defendant responded: "I didn't know what was going on. All I know is that right when I walked up there, those people was saying, 'Hey, what's up cuzz, what's up cuzz?' and after—like they were just trying, just trying to like—like trying—just trying to like mess

14

with me.  Like there were like five people up there."  Grandfather told defendant he should have called the police, and defendant responded:  "I didn't think somebody was gonna lay [*sic*] down in the freaking street."

In June 2009, while defendant was still in custody, he wrote a rambling, semi-literate letter to his younger sister, who had attempted suicide.  Police recovered the letter.  Much of the letter consisted of descriptions of the poor conditions under which defendant had been raised, together with lamentations over his life as a prisoner.  Among other things, defendant wrote:  "Now I[']m a fuck'n killer wit no more get back."  Similarly he wrote, "I[']m facen [*sic*] murder."

2.  *Procedural Background*

The prosecution moved in limine to admit inculpatory portions of both statements as admissions of a party opponent.  In response, defendant argued under Evidence Code section 356 (the rule of completeness) that exculpatory portions of the jailhouse conversation between defendant and Grandfather should also be admitted.  Similarly, as to defendant's letter to his sister, defendant argued it would be misleading to introduce only some portions of the letter without admitting the rest of the letter for context.  The trial court agreed with defendant and ruled the complete letter would be admitted under Evidence Code section 356, except for portions of the statements discussing possible penalties.  As to the conversation with Grandfather, the court also agreed with defendant and ruled that specific portions of the conversation requested by defendant would be admitted.

The prosecution then moved orally and in writing to introduce evidence of defendant's prior convictions and bad acts under *Jacobs*, *supra*, 78 Cal.App.4th 1444. The prosecution argued that because defendant had sought to introduce portions of his own out-of-court statements, the prosecution was entitled to impeach their credibility under Evidence Code section 1202.  Defendant opposed the motion on the ground that the statements he sought to introduce were not exculpatory, and that, under *People v.*

15

*Fritz* (2007) 153 Cal.App.4th 949 (*Fritz*), Evidence Code section 1202 did not make his prior bad acts admissible. The trial court granted the prosecution's motion under *Jacobs*, *supra*, and *People v. Little* (2012) 206 Cal.App.4th 1364 (*Little*), subject to a limiting instruction that the evidence could only be considered to evaluate the credibility of defendant's statements.

At trial, the prosecution played an audio recording of defendant's jailhouse conversation with Grandfather, and the jury was provided with a transcript. Defendant's letter to his sister was also admitted, but with references to potential penalties redacted. Evidence of defendant's prior convictions and bad acts was also presented to the jury as set forth above in Section I.A.9. The court instructed the jury that the evidence was "offered for the purposes of determining credibility only. If you find that a witness or person who made a statement outside of court committed certain crimes or other misconduct, you may consider that fact only in evaluating the credibility of that person. The fact that a witness or a person who made the statement outside of court may have committed misconduct does not necessarily destroy or impair that person's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable or not."

In closing argument, counsel for defendant contested the prosecution's claim that defendant had intentionally driven over Fife. Counsel argued that defendant was simply trying to get away from a hostile crowd of neighbors yelling at him, and that he did not see Fife. Counsel specifically quoted defendant's statement to Grandfather that he did not know someone was going to "lie down in the street." The prosecution challenged the credibility of this statement and argued that defendant was trying to manipulate Grandfather into staying on his side. The prosecution pointed to defendant's prior convictions and bad acts to support the claim that defendant was lying in an effort to manipulate Grandfather.

16

3. *Legal Principles*

Evidence Code section 788 provides, in part: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony . . . ." (Evid. Code, § 788.) Evidence Code section 1202 provides, in part: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing." (Evid. Code, § 1202.) "Taken together, sections 1202 and 788 seem to provide that evidence of prior felony convictions is admissible to attack the credibility of a hearsay declarant." (*Jacobs*, *supra*, 78 Cal.App.4th at p. 1449.)

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "When evidence of prior offenses is presented to a jury, there is inherent danger of prejudice to an accused. Therefore, such evidence should be received with caution and admitted only when its probative value outweighs its prejudicial effect." (*People v. Evers* (1992) 10 Cal.App.4th 588, 599.)

We review the admission of evidence under the aforementioned rules for abuse of discretion. (*People v. Story* (2009) 45 Cal.4th 1282, 1295; *People v. Guerra* (2006) 37 Cal.4th 1067, 1113 [overruled in part on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151].)

17

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694.) " 'Tactical errors are generally not deemed reversible; and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, [the appellate court] will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." ' " (*People v. Hart* (1999) 20 Cal.4th 546, 623-624 (*Hart*).)

4. *Admission of the Evidence Under Evidence Code Sections 788 and 1202 Was Not an Abuse of Discretion*

On appeal, defendant specifically challenges the admission of the following convictions and prior bad acts: (1) Grandfather's testimony that when defendant was 17 years old he failed to return to a juvenile custody facility after coming home for a furlough; (2) testimony that defendant had stolen the Mitsubishi Eclipse involved in the April 2006 reckless driving incident; (3) court records proving defendant's convictions for reckless driving and driving without a license in connection with the June 2008 incident; (4) court documents proving defendant's convictions for assault and false imprisonment upon his sister, grand theft of a bicycle, and receiving stolen property; (5) testimony about defendant's assault on fellow inmate Jesse Madrigal in December 2010; and (6) testimony about defendant's assault on fellow inmate Mario Garcia in March 2010. Defendant does not contest the premise that this evidence would have been

18

admissible for impeachment purposes if he had testified. Nor does he contest the holding of *Jacobs, supra,* that prior convictions and bad acts may be admissible to impeach the credibility of a defendant as a hearsay declarant when the defendant seeks to introduce his own exculpatory hearsay statements. Rather, defendant contends there was no valid basis for impeachment because the portions of his statements he offered into evidence were not exculpatory. The Attorney General argues that the statements defendant sought to admit were exculpatory, and that his prior acts were therefore admissible under *Jacobs* to impeach his credibility.

In *Jacobs*, *supra*, 78 Cal.App.4th 1444, Jacobs and a codefendant were charged with receiving stolen property. The codefendant sought to admit part of a statement Jacobs made to police wherein Jacobs admitted owning the car in which the stolen property was found. Jacobs moved under Evidence Codes section 356 to admit the rest of his statement, wherein he gave an innocent explanation for how he came into possession of the stolen property. The prosecution objected to the latter part of the statement. After the trial court admitted the entire statement, the prosecution sought to impeach Jacobs' credibility by introducing evidence of his prior felony convictions. The trial court granted the prosecution's motion, and the jury subsequently found Jacobs guilty. The Court of Appeal affirmed Jacobs' conviction. (*Jacobs*, *supra*, 78 Cal.App.4th at p. 1454.) The court held that Jacobs' prior convictions were admissible under the combined scope of Evidence Code sections 788 and 1202. (*Id.* at p. 1446.) Other courts have found this reasoning persuasive. (*Little*, *supra*, 206 Cal.App.4th at p. 1367; cf. *Fritz*, *supra*, 153 Cal.App.4th at p. 956 [holding of *Jacobs* was not applicable because only the prosecution—not the defendant—sought to introduce defendant's hearsay statements].)

We find no basis in the record to distinguish *Jacobs* from the present case. We disagree with defendant's claim that the portions of the statements he sought to introduce

were not exculpatory.[3]  Defendant's defense focused on attacking the element of intent. He characterized his act of exiting his house and driving away in the Honda solely as an attempt to escape from the group of neighbors gathered outside.  His jailhouse statements to Grandfather—that the neighbors were questioning him and "trying to like mess with me"—supported this version of events.  More significantly, defendant told Grandfather, "I didn't think somebody was gonna lay [*sic*] down in the freaking street."  Defense counsel specifically quoted this statement in closing argument as evidence that defendant did not intentionally run over Fife.

Defendant's letter to his sister also contained some exculpatory statements.  Much of the letter consisted of regret for the things defendant had done and excuses for his own behavior based upon his poor upbringing.  As trial counsel recognized, the full context of the letter substantially softened the inculpatory force of the statement introduced by the prosecution, in which defendant described himself as a "killer wit no more get back."  The prosecution also argued, among other things, that defendant was guilty of murder under an implied malice theory of intent—commonly called "depraved heart murder." As the court instructed the jury, implied malice requires a finding that a defendant "deliberately acted in conscious disregard for human life."  The jury could have inferred from defendant's statements of regret that he did not kill Fife with a depraved heart.

Because defendant introduced his own exculpatory hearsay statements into evidence, the prosecution was entitled to impeach him with his prior convictions under Evidence Code sections 788 and 1202.  We thus conclude the trial court did not abuse its discretion by admitting evidence of defendant's prior convictions and bad acts.

---

[3] In some parts of his brief, appellate counsel also refers to portions of the statements as "arguably exculpatory."

5. *Admission of the Evidence Did Not Violate Defendant's Federal Due Process Rights*

Defendant argues the evidence was also admitted as propensity evidence in violation of his federal due process rights under the Fifth and Fourteenth Amendments. As defendant acknowledges, however, "[e]vidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions. Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process." (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920.)

Here, the jury was instructed it could only consider the prior convictions and bad acts for the purposes of evaluating defendant's credibility. Defendant argues that the jury must have been confused by this instruction, but he cites nothing in the record to support this assertion. In closing argument, defendant put forth his own statements as evidence of his state of mind, and the prosecution referred to the prior convictions to challenge the credibility of these statements. As set forth above, the jury was permitted to use the evidence to assess defendant's credibility, and nothing in the record suggests the jury did otherwise. We conclude this claim is without merit.

6. *Admission of the Evidence Was Not an Abuse of Discretion Under Evidence Code Section 352*

Defendant contends the admission of evidence of his prior convictions and bad acts constituted an abuse of discretion under Evidence Code section 352 because the prejudicial effect of the evidence substantially outweighed its probative value. In pretrial hearings, the trial court weighed the probative value of the evidence against any potential prejudice. The court then set forth its conclusions under Evidence Code section 352. The court admitted the evidence, but excluded certain evidence as unduly prejudicial, such as the claim that defendant had raped his unconscious sister. The court concluded

the remaining evidence was sufficiently probative to justify its admission given its relevance to the credibility of defendant's statements.

We agree the evidence was probative. And although evidence of prior convictions and bad acts carries some potential to induce prejudice, defendant has not shown that the conduct introduced into evidence here was so prejudicial that it substantially outweighed its probative value. We conclude the trial court did not abuse its discretion by admitting the evidence under Evidence Code section 352.

7. *Trial Counsel Did Not Provide Ineffective Assistance of Counsel*

Defendant contends his trial counsel provided ineffective assistance by seeking to admit defendant's statements and thereby opening the door to the admission of his prior convictions and bad acts. But the record of the pretrial hearings makes clear that counsel understood he was opening the door to impeachment by seeking to admit defendant's statements. Counsel stated on the record that he wished to introduce defendant's statements as evidence of his state of mind. On appeal, defendant acknowledges these points. The obvious implication is that counsel made a considered tactical decision to put his client's exculpatory statements into evidence at the cost of allowing impeachment evidence to come in. Nonetheless, defendant contends trial counsel did not make "a rational and informed decision on strategy and tactics . . . ." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) He argues that no reasonable trial lawyer could have believed that the exculpatory value of defendant's statements would outweigh the damaging prejudicial impact of the impeachment evidence.

We decline to second-guess trial counsel's tactical choices. "Tactical errors are generally not deemed reversible . . . ." (*Hart*, *supra*, 20 Cal.4th at p. 623.) While we recognize the potentially prejudicial effect of prior convictions, defendant's statements were not without exculpatory value. There was no question defendant drove the Honda Civic over Donna Fife, thereby killing her. His defense was to challenge the prosecution's claim that he did so with malice. His exculpatory statements directly

22

supported this defense strategy.  Accordingly, we conclude trial counsel's tactical choice to seek admission of this evidence did not fall below the constitutionally required standard of representation.

B. *The Trial Court's Refusal to Instruct the Jury on Manslaughter*

Defendant contends the trial court violated his federal due process rights by failing to instruct the jury on vehicular manslaughter or involuntary manslaughter.  He argues that both of these offenses constituted a lesser included offense of the murder charge.  The Attorney General argues that neither form of manslaughter constitutes a lesser included offense of murder when the defendant uses a vehicle to commit a homicide.  We find no error in the trial court's refusal to instruct the jury on manslaughter.

1. *Procedural Background*

The prosecution charged defendant with a single count of murder.  (§ 187.)  The information alleged, in relevant part:  "On or about January 19, 2009, in the County of Santa Clara, State of California, the crime of MURDER, in violation of PENAL CODE SECTION 187, a Felony, was committed by RICHARD ANTHONY DELGADO III who did unlawfully and with malice aforethought, kill Donna Fife, a human being."

During in limine motions, the parties litigated the issue of whether the trial court should instruct the jury on vehicular manslaughter or involuntary manslaughter as lesser included offenses.[4]  Defendant argued that the trial court should instruct the jury on manslaughter under either subdivision (b) [involuntary manslaughter] or (c) [vehicular manslaughter] of section 192.  The prosecution opposed any such instructions on the ground that these lesser included offenses do not apply when a vehicle is used to commit a homicide.  The trial court denied defendant's request and refused to instruct the jury on either theory of manslaughter.  Based on the language of section 192 and cases

---

[4] As defendant notes, the trial court in the first trial instructed the jury on involuntary manslaughter.  The prosecution subsequently argued the instruction should not have been given.

23

construing it, the court concluded that neither involuntary manslaughter nor vehicular manslaughter is a lesser included offense of murder when the offense is committed with a vehicle.

2. *Legal Principles*

Involuntary manslaughter and vehicular manslaughter are two separate and distinct offenses. Subdivision (b) of section 192 defines the offense of involuntary manslaughter and further provides that "[t]his subdivision shall not apply to acts committed in the driving of a vehicle." Subdivision (c) of section 192 defines the offense of vehicular manslaughter under three separate subdivisions, each of which requires the element of "driving a vehicle" as part of the offense.

"[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Case law sets forth two tests to determine whether a lesser offense is necessarily included in a greater offense: the statutory elements test, and the accusatory pleading test. "[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117.) "We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense." (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

3. *The Trial Court Properly Refused to Instruct the Jury on Manslaughter*

As a general matter, manslaughter can be a lesser included offense of murder. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1080 [overruled on other grounds by *People v. Hill* (1998) 17 Cal.4th 800].) However, *vehicular* manslaughter cannot be a lesser included offense of murder under the statutory elements test. This is so because the offense of vehicular manslaughter includes the element of driving a vehicle, which is not

24

an element of murder. Therefore, by killing a victim without using a vehicle, one can commit murder without committing vehicular manslaughter. (See *People v. Sanchez* (2001) 24 Cal.4th 983, 989 [gross vehicular manslaughter while intoxicated is not a lesser included offense of murder because it requires proof of elements not required to prove murder].)

In his opening brief, defendant contends vehicular manslaughter is nonetheless a lesser included offense of murder *in this case* under the accusatory pleading test. He contends the prosecution inserted the element of driving a vehicle in the charged offense because the information included an enhancement allegation that defendant personally used a car as a deadly and dangerous weapon in the commission of the offense. The Attorney General argues that elements alleged as part of an enhancement must be disregarded for the purposes of the accusatory pleading test. In his reply brief, defendant concedes the point.

Defendant's concession is well-taken. The law is settled that special allegations add nothing to the accusatory pleading test. (*People v. Wolcott* (1983) 34 Cal.3d 92, 100-102.) Because the charge of murder set forth in the information alleged defendant's conduct generally, without mention of a vehicle, vehicular manslaughter is not a lesser included offense under the accusatory pleading test.

Nor can involuntary manslaughter be a lesser included offense of murder when a defendant drives a vehicle in the commission of the murder. The plain language of the subdivision defining involuntary manslaughter provides that "[t]his subdivision shall not apply to acts committed in the driving of a vehicle."

Based on the evolution of the statute and its legislative history, defendant argues that the Legislature did not intend to eliminate the possibility of involuntary manslaughter as a lesser included offense of vehicular murder. When construing a statute, however, " 'we begin with the words of a statute and give these words their ordinary meaning.'

25

[Citation.] 'If the statutory language is clear and unambiguous, then we need go no further.' " (*People v. Sinohui* (2002) 28 Cal.4th 205, 211.)

Here, the plain language of the statute is unambiguous; we have no occasion to resort to extrinsic aids in determining the Legislature's intent. The statute clearly and unambiguously eliminates the offense of involuntary manslaughter when the act is committed in the driving of a vehicle. This construction of section 192 is further supported by the case law. (See *People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1082 [although involuntary manslaughter is usually a lesser included offense of murder, in the context of drunk driving it is not].) For these reasons, we find this claim without merit.

C. *The Jury's Request for Clarification of the Meaning of "Unlawful Intent"*

The trial court instructed the jury in accord with CALCRIM No. 510 on excusable homicide as the result of accident or misfortune. Among other things, the jury requested clarification of the meaning of the phrase "unlawful intent" as used in the instruction. The trial court declined to provide the requested clarification. Defendant contends the trial court erred in doing so. We agree with defendant that the court should have provided clarifying instructions to the jury, but we conclude its failure to do so was harmless.

1. *Procedural Background*

The trial court instructed the jury as follows: "The defendant is not guilty of murder if he killed someone as a result of accident or misfortune. Such killing is excused and therefore not unlawful if: 1. The defendant was doing a lawful act in a[] lawful way; 2. The defendant was acting with usual and ordinary caution; and 3. The defendant was acting without any unlawful intent. [¶] A person acts with usual and ordinary caution if he or she acts in a way that a reasonably careful person would act in the same or similar situation."

26

During its deliberations, the jury sent the following two questions to the court: "Instruction #510, does it have to met [*sic*] all three to be an act of accident or misfortune. Can you please explain in laymen terms #3."

The parties agreed that the first question should be answered in the affirmative. As to the second question, the trial court initially proposed to instruct the jury that "without any unlawful intent" "means the defendant was acting with a lawful intent and without the intent or mental state required for murder." The instruction would then refer the jury back to the previously given instructions defining the requisite levels of intent for murder. Defendant agreed with the proposed instruction. The prosecution objected to this instruction and requested the court to instruct the jury that "[a] defendant acts with unlawful intent when he acts with the intent to commit any crime. The unlawful intent in the third element may be any unlawful intent including, but not limited to, intending to assault someone with a car, intending to temporarily or permanently deprive someone of their car, intending to leave the scene or collision without notifying the owner of the damaged property and intending to drive without a license . . . ." The court rejected this proposed instruction based on *People v. Anderson* (2011) 51 Cal.4th 989, 997-998 (*Anderson*).

After further argument, the trial court changed course and decided not to provide further clarification. The court sent a written note to the jury stating, in part: "You are correct, all three of the circumstances listed in instruction 510 must be present to constitute accident or misfortune. Regarding circumstance No. 3, the law does not allow me to supplement the instructions with information on this issue."

2. *Legal Principles*

Section 1138 provides, in part: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court." (§ 1138.) "The court has a primary duty to help the jury understand the

27

legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) The court "must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Ibid.*) "A violation of section 1138 does not warrant reversal unless prejudice is shown." (*Ibid.*)

       3. *Any Failure to Further Instruct the Jury Was Harmless*

The instruction at issue here was sufficiently ambiguous to warrant further clarification. On its face, the instruction's reference to "without any unlawful intent" does not make clear whether the lack of unlawful intent pertains solely to the offense charged, or whether the defendant must not harbor *any* kind of unlawful intent with respect to any potential offense. The ambiguity in the language is underscored by the failure of the parties below to agree on its meaning. No layperson could reasonably be required to ascertain what experienced lawyers could not.

We also note the Attorney General concedes the law is clear that the phrase "without any unlawful intent" refers to the defendant's intent with respect to the commission of the charged offense. (*Anderson*, *supra*, 51 Cal.4th at pp. 997-998.) The trial court should have answered the jury's question accordingly. The trial court's failure to do so, however, was harmless.

Defendant argues he was prejudiced because the instruction pertained to the issue of intent, and the evidence did not overwhelmingly establish that he intentionally killed Fife. This argument ignores the other elements of the instruction: that defendant was doing a lawful act in a lawful way, and that he was acting with usual and ordinary caution. The jury could not have found the killing to be excused under the instruction without concluding that these other two conditions were also met. No rational jury could

28

have concluded that defendant's actions—accelerating a car across a neighbor's lawn late at night while multiple neighbors stood around the area—constituted a lawful act done in a lawful way "with usual and ordinary caution." Because the jury initially did not understand they were required to find all three elements of the instruction, it is understandable they inquired about the third element. But once the jury was properly instructed that it had to find all three elements were met to find the killing excused, any error relating to the third element was rendered harmless under any standard of review.

For these reasons, we conclude this claim is without merit. And finally, as to defendant's claim of cumulative error, we find no other error contributing any potential prejudice. Accordingly, we will affirm the judgment.

### III. DISPOSITION

The judgment is affirmed.

_____

                                        MÁRQUEZ, J.

We concur:

_____

RUSHING, P. J.

_____

WALSH, J.[*]

H039723
People v. Delgado

---

[*]Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.